**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| Jose Enrique Gonzalez Rodriguez, | **Case No.** 4:23-cv-00335 |
| Plaintiff, | |
| v. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Equifax Information Services, LLC; Trans Union LLC; and Oriental Financial Services LLC, | |
| Defendants. | |

Jose Enrique Gonzalez Rodriguez ("Plaintiff" or "Mr. Gonzalez Rodriguez") brings this action on an individual basis, against Equifax Information Services, LLC ("Equifax"), Trans Union LLC, ("TU"), (collectively, "CRA Defendants") and Oriental Financial Services LLC ("Oriental") (collectively "Defendants") and states as follows:

## INTRODUCTION

1.      Plaintiff, an identity theft victim, brings this action against Defendants for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, et. seq.

2.      More than twenty million people, just under 10% of all adult Americans, are victims of identity theft each year.[1] Federal Law requires that each consumer reporting agency ("CRA") protect victims by taking steps to remove fraudulent information from victims' reports, to ensure that only third parties with permissible purposes see victims' reports and to implement fraud alerts and security freezes at victims' requests.  This lawsuit arises from Defendant's refusal to comply with these statutory requirements and resulting failure to protect Plaintiff from identity theft and

---

[1] Victims of Identity Theft, 2018, 1. U.S. Dept. of Justice, Bureau of Justice Statistics.  April 2021, NCJ 256085.

identity theft consequences.

3.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service, or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

4.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

5.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

6.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

7.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. ("FCRA"), federal law has required CRAs to implement and utilize reasonable

procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

8.     One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

9.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

10.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate

information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

11.    In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." See 15 U. S.C. § 1681(a)(4).

12.    The FCRA also requires Furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

13.    Plaintiff's claims arise out of the Defendants plainly deficient reinvestigations considering Plaintiff's multiple disputes and repeated notice that he was a victim of identity theft.

14.    Accordingly, Plaintiff brings claims against the CRA Defendants, for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of identity theft, and for failing to delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i, and for failing to block the identity theft items as disputed and supported by Plaintiff in violation of the FCRA, 15 U.S.C. § 1681c-2.

15.    Further, Plaintiff also brings claims against the Furnisher, Defendant Oriental, for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of identity theft, and for failing to delete the disputed

information from Plaintiff's credit file, in violation of FCRA, 15 U.S.C. § 1681s-2b.

16.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs, and attorneys' fees from the Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq., as described herein.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of the FCRA, a federal law. See 15 U.S.C. § 1681p (FCRA) (permitting actions to enforce liability in an appropriate United States District Court).

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Defendants regularly transacts business within this District, are otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

19.     Jose Enrique Gonzalez Rodriguez ("Plaintiff" or "Mr. Gonzalez Rodriguez") is a natural person residing in Princeton, Texas, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

20.     Defendant Equifax Information Services, LLC ("Equifax") is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of Texas, including within this District. Equifax can be served through its registered agent, Corporation Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

21.     Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in

15 U.S.C. § 1681a(d)) to third parties.

22.     The information that Equifax collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans.   Equifax also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

23.     Equifax collects and maintains such information about consumers, whether consumers like it or not.   Consumers do not have a choice as to whether Equifax collects and maintains information about them.   Not only that, but consumers cannot remove information that Equifax collects and maintains about them from the Equifax database.   Further, Equifax sells that information about consumers for its unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that Equifax sold.

24.     Defendant Trans Union LLC ("Trans Union") is a corporation with a principal place of business located at 555 West Adams Street, Chicago, IL 60661, and is authorized to do business in the State of Michigan, including within this District. Trans Union can be served through its registered agent, Illinois Corporation Service Company, located at 801 Adlai Stevenson Drive, Springfield, IL 62703.

25.     Defendant Trans Union is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f) and is a "person" as defined by 15 U.S.C. § 1681a(b). Defendant Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

26.     The information that Defendant Trans Union collects, maintains, and sells includes

confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans. Defendant Trans Union also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

27.     Defendant Oriental Financial Services LLC ("Oriental") is a limited liability company with a principal place of business located at Oriental Center, 254 Muñoz Rivera Avenue, San Juan, Puerto Rico 00918, and is authorized to do business in the State of Texas, including within this District. Oriental can be served through its registered agent, Oriental Bank, located at 254 Muñoz Rivera Avenue, San Juan, Puerto Rico 00918.

28.     Oriental is a "Furnisher" as defined in 12 CFR 1022.41. Oriental regularly furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report.   A data furnisher, such as Oriental, is an entity that reports information about consumers to consumer reporting agencies (CRAs), which may include credit bureaus, tenant screening companies, check verification services, and medical information services, etc.  Like CRAs and data users, data furnishers have legal obligations and rules that must be upheld & followed pursuant to 15 U.S.C. §1681s-2b of the FCRA.

## SUMMARY OF THE FAIR CREDIT REPORTING ACT

29.     The FCRA governs the conduct of consumer reporting agencies to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

30.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the

very first provision of the FCRA. See 15 U.S.C. § 1681(a).

31.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information.  See 15 U.S.C. § 1681(b).

32.     Congress also recognized that CRAs such as Equifax and Trans Union "have assumed a vital role in assembling and evaluating consumer credit and other information on consumers."  15 U.S.C. § 1681(a)(3).  Therefore, Congress determined that there "is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy."   15 U.S.C. § 1681(a)(4).

33.     For that reason, Congress ensured that the FCRA also provides special protections for victims of identity theft.

34.     The first form of protection is the "block."   When a consumer identifies any information in their credit file that is the product of identity theft, the CRA must block (delete) the reporting of that information within four business days, provided the consumer submits:

    a.     Appropriate proof of the identity of the consumer;

    b.     A copy of an identity theft report;

    c.     The identification of such information by the consumer; and,

    d.     A statement by the consumer that the information is not information relating to any transaction by the consumer.

15 U.S.C. § 1681c-2(a).15 U.S.C. § 1681c-2(a).

35.     The second form of protection the FCRA provides for identity theft victims is the

"fraud alert."

36.     Specifically, upon request of the consumer, a CRA must place an "initial fraud alert" in the file of that consumer, and provide that alert along with any credit score generated in using that file, for one year beginning on the date of the request.  Unless one year has passed, the CRA can only remove the alert if the consumer requests removal and the CRA receives "appropriate proof of the identity of the requester." 15 U.S.C. § 1681c-1(a)(1).

37.     The third form of protection the FCRA provides for identity theft victims is a "security freeze," which a consumer can request from nationwide CRAs such as the Defendant here.

38.     A security freeze prohibits a CRA from disclosing the contents of a consumer report that is subject to the freeze to any person requesting the consumer report.[2] 15 U.S.C. § 1681c-1(i)(1).  Stated otherwise, if a consumer's report is frozen, a CRA will not be able to sell it to creditors assessing credit applications from identity thieves using an affected consumer's identity.

39.     Once placed, a security freeze does not expire.  A CRA can remove a security freeze **only** at "the direct request of the consumer," or if it finds that the freeze "was placed due to a material misrepresentation of fact by the consumer." 15 U.S.C. § 1681c-1(i)(3)(A).  Furthermore, when a consumer requests removal, the CRA must first obtain "proper identification" from the consumer before removing the freeze."  15 U.S.C. § 1681c-1(i)(3)(C).

40.     The fourth and final form of protection the FCRA provides for identity theft victims is that even in the absence of a security freeze, a CRA may only release a consumer report to a person "which it has reason to believe...intends to use the information in connection with a credit

---

[2] Certain statutorily exempt entities can still request and receive a frozen report.  See 15 U.S.C. § 1681c-1(i)(4).  But those exemptions do not apply to the matter at hand.

transaction involving the consumer on whom the information is to be furnished..." 15 U.S.C. § 1681b(a). When a credit transaction is not initiated by the consumer, a CRA may **only** release the consumer's report with the consumer's authorization or if the user is making a firm offer of credit. 15 U.S.C. § 1681b(c).  No consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a permissible purpose.  15 U.S.C. § 1681e(a).

41.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

42.     Similarly, the FCRA also imposes a duty upon the Furnishers, such as Oriental, to reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies. (15 U.S.C. § 1681s-2b).

43.     The FCRA provides consumers with a private right of action against consumer reporting agencies, such as the CRA Defendants, and data furnishers such as Oriental, that willfully or negligently fail to comply with their statutory obligations under the FCRA.

### FACTUAL ALLEGATIONS
### Plaintiff Applies to DHI for a Mortgage

44.     In or around April 2023, Plaintiff decided that he wanted to purchase a home. Accordingly, after looking at potential lenders, Plaintiff determined that he would submit an application for a mortgage with non-party DHI Mortgage ("DHI").

45.     Plaintiff chose DHI because it appeared to offer favorable terms and rates for a mortgage.

46.     Plaintiff anticipated that his mortgage application would be approved.

47.     Thereafter, in or around April 2023, Plaintiff completed and submitted a mortgage application with DHI to obtain financing for a mortgage for the purchase of a home. Plaintiff provided all of Plaintiff's personal identification information, including his social security number, and provided consent for DHI to obtain Plaintiff's consumer reports and/or credit scores in order to determine Plaintiff's credit eligibility for financing purposes.

**DHI Denies Plaintiff's Mortgage Application**

48.     Upon information and belief, shortly after submitting his mortgage application, Plaintiff learned that DHI was unable to approve Plaintiff for a mortgage because the CRA Defendants published information to DHI indicating that Plaintiff had an open, derogatory mortgage account with Oriental Bank.

49.     Plaintiff was shocked and confused. Plaintiff did have an open mortgage account with Oriental Bank.

50.     Plaintiff did not, nor has Plaintiff ever had a mortgage account with Oriental Bank.

51.     Plaintiff never authorized anyone to apply for a mortgage with Oriental Bank on his behalf.

52.     Plaintiff was very panicked, confused, and concerned about the impact of the records of another consumer being reported on Plaintiff's consumer reports – specifically, the impact of the same on his future.

53.     Upon information and belief, in or around April 2023, DHI denied Plaintiff's mortgage application based upon the contents of Defendants Equifax's and Trans Union's consumer reports sold about Plaintiff.

**Plaintiff Applies to M/I Financial, LLC for a Mortgage**

54.     In or around May 2023, still in need of a mortgage and thinking that perhaps there was just a fluke in DHI's system, Plaintiff decided that he would try again tried to obtain a mortgage from another lender. Accordingly, after looking at potential lenders, Plaintiff determined that he would submit an application for a mortgage with non-party M/I Financial, LLC ("M/I Financial").

55.     Plaintiff chose M/I Financial, LLC because it appeared to offer favorable terms and rates for a mortgage.

56.     Plaintiff anticipated that his mortgage application to M/I Financial would be approved.

57.     Thereafter, in or around May 2023, Plaintiff completed and submitted a mortgage application with M/I Financial to obtain financing for a mortgage for the purchase of a home. Plaintiff provided all of Plaintiff's personal identification information, including his social security number, and provided consent for M/I Financial to obtain Plaintiff's consumer reports and/or credit scores in order to determine Plaintiff's credit eligibility for financing purposes.

**M/I Financial Denies Plaintiff's Mortgage Application**

58.     Upon information and belief, shortly after submitting his mortgage application, Plaintiff learned that M/I Financial was unable to approve Plaintiff for a mortgage because the CRA Defendants published information to M/I indicating that Plaintiff had an open, derogatory mortgage account with Oriental Bank.

59.     Plaintiff was very panicked, confused, and concerned about the impact of the records of another consumer being reported on Plaintiff's consumer reports – specifically, the impact of the same on his future.

60.     Plaintiff now came to suspect that the Oriental Bank mortgage account was the product of identity theft.

61.     Upon information and belief, in or around May 2023, M/I denied Plaintiff's mortgage application based upon the contents of Defendants Equifax's and Trans Union's consumer reports sold about Plaintiff.

62.     In or around July 2023, still in need of a mortgage, Plaintiff again attempted to obtain a mortgage with M/I Financial.

63.     Upon information and belief, the M/I Financial representative informed Plaintiff that his application for the terms requested would not be successful due to the derogatory reporting of the Oriental Bank mortgage account.

64.     Upon information and belief, the M/I Financial representative counter offered Plaintiff's requested terms and offered an interest rate much higher than Plaintiff had applied for and was expecting.

**Plaintiff Disputes Directly with Defendant Oriental Bank**

65.     Around the same time as his mortgage applications to M/I Financial, Plaintiff contacted Oriental Bank.

66.     Plaintiff spoke to an Oriental Bank representative and inquired about the Oriental Bank account that continued to be reported by the CRA Defendants.

67.     The Oriental Bank representative confirmed that there was an Oriental Bank mortgage associated with his social security number and name.

68.     Plaintiff was shocked. He had never applied for a mortgage with Oriental Bank.

69.     Plaintiff disputed the Oriental Bank Mortgage with Oriental Bank as the product of fraud and identity theft.

**Plaintiff Obtains His Credit Reports and Confirms the Reporting of the Oriental Bank Mortgage in Plaintiff's Consumer Files**

70.     On or about the time he disputed directly with Defendant Oriental Bank, Plaintiff also obtained a copy of his consumer files and, upon review, saw that an Oriental Bank Mortgage (Account Number: 1391450) opened on December 8, 2006 ("Oriental Bank Mortgage") was reporting to his consumer files and reports.

71.     Thereafter, on July 31, 2023, Plaintiff filed an FTC Identity Theft Report and identified the Oriental Bank Mortgage as the product of fraud and identity theft.

72.     On August 15, 2023, Plaintiff filed a police report with the Allen Police Department and identified the Oriental Bank Mortgage as the product of fraud and identity theft.

**Plaintiff's First Dispute to the CRA Defendants**

73.     Concerned that Defendant Oriental Bank would continue to report inaccurately to the one or more consumer reporting agencies that Plaintiff was responsible for the approximately $40,000.00 mortgage, Plaintiff determined that he needed to escalate the issue to prevent further damage to his credit files and reports.

74.     Sometime prior to August 24, 2023, Plaintiff disputed the Oriental Bank Mortgage Account with the CRA Defendants. Specifically, Plaintiff disputed that the Oriental Bank Mortgage Account was not his, but rather the product of fraud and identity theft.

75.     Plaintiff provided sufficient information to identify his credit file and sufficient information to support his dispute.

76.     Plaintiff requested that the identity theft information be blocked from his credit file.

**Defendant Equifax's Unreasonable Dispute Reinvestigation**

77.     Sometime prior to August 26, 2023, Defendant Equifax received Plaintiff's dispute and request that identity theft information be blocked from his credit file.

78.     Upon information and belief, Defendant Equifax sent Defendant Oriental Bank an automated credit dispute verification ("ACDV") pursuant to Plaintiff's August 2023 dispute to Defendant Equifax.

79.     Upon information and belief, Defendant Oriental Bank received Defendant Equifax's ACDV and did not adequately reinvestigate Plaintiff's dispute.

80.     On August 26, 2023, Defendant Equifax issued dispute results to Plaintiff wherein it communicated that the disputed information was *modified* rather than blocked.

81.     Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff.

82.     Defendant Equifax failed to reinvestigate Plaintiff's August 2023 dispute and failed to block the identity theft information.

83.     Defendant Equifax violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed charges were the product of identity theft.

**Defendant Trans Union's Unreasonable Dispute Reinvestigation**

84.     Sometime prior to August 24, 2023, Defendant Trans Union received Plaintiff's dispute and request that identity theft information be blocked from his credit file.

85.     Upon information and belief, Defendant Trans Union sent Defendant Oriental Bank an automated credit dispute verification ("ACDV") pursuant to Plaintiff's August 2023 dispute to Defendant Trans Union.

86.     Upon information and belief, Defendant Oriental Bank received Defendant Trans Union's ACDV and did not adequately reinvestigate Plaintiff's dispute.

87.     On August 24, 2023, Defendant Trans Union issued dispute results to Plaintiff

wherein it communicated that the disputed information was modified rather than blocked.

88.     Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff.

89.     Defendant Trans Union failed to reinvestigate Plaintiff's August 2023 dispute and failed to block the identity theft information.

90.     Defendant Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed charges were the product of identity theft.

**The CRA Defendants' Method for Considering Consumer Credit Report Disputes**

91.     The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

92.     The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance.  e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

93.     That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II."

94.     It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

95.     Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports

issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

96.     Metro II codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

97.     The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

98.     These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

99.     Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

100.    The data furnishers, like Defendant Oriental Bank, then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

101.    Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**Defendant Oriental Bank's Unreasonable Dispute Investigation August 2023**

102.    Upon information and belief, Defendant Oriental Bank failed to adequately review all of the information provided to it by Plaintiff.

103.    Upon information and belief, Defendant Oriental Bank verified the disputed

information as accurate in response to Defendant Equifax's ACDV.

104.    Upon information and belief, Defendant Oriental Bank verified the disputed information as accurate in response to Defendant Trans Union's ACDV.

105.    Defendant Oriental Bank violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed Oriental Bank Mortgage Account was the product of identity theft.

### Plaintiff's Second Dispute to the CRA Defendants

106.    Upset that his disputes were not taken seriously, and concerned that eventually someone might seek to collect the approximately $40,000.00 mortgage and that the continued reporting of the mortgage would continue to frustrate his mortgage applications, Plaintiff determined that he needed to dispute the Oriental Bank Mortgage Account again.

107.    Sometime after receiving the dispute results from the Credit Bureau Defendants in August 2023, Plaintiff again disputed the Oriental Bank Mortgage Account with the CRA Defendants. Specifically, Plaintiff disputed that the Oriental Bank Mortgage Account was not his, but rather the product of fraud and identity theft.

108.    Plaintiff provided sufficient information to identify his credit file and sufficient information to support his dispute.

109.    Plaintiff requested that the identity theft information be blocked from his credit file.

### Defendant Trans Union's Unreasonable Dispute Reinvestigation

110.    Sometime prior to September 12, 2023, Defendant Trans Union received from Plaintiff another dispute and request that identity theft information be blocked from his credit file.

111.    Upon information and belief, Defendant Trans Union sent Defendant Oriental Bank an ACDV pursuant to Plaintiff's dispute to Defendant Trans Union.

112.    Upon information and belief, Defendant Oriental Bank received Defendant Trans Union's ACDV and did not adequately reinvestigate Plaintiff's dispute.

113.    On September 12, 2023, Defendant Trans Union issued dispute results to Plaintiff wherein it communicated that the disputed information was modified rather than blocked.

114.    In relation to its September 12, 2023 response, Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff.

115.    In relation to its September 12, 2023 response, Defendant Trans Union failed to reinvestigate Plaintiff's dispute and failed to block the identity theft information.

116.    Defendant Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed charges were the product of identity theft.

**Defendant Oriental Bank's Unreasonable Dispute Investigation September 2023**

117.    Upon information and belief, Defendant Oriental Bank failed to adequately review all of the information provided to it by Plaintiff.

118.    Upon information and belief, Defendant Oriental Bank verified the disputed information as accurate in response to Defendant Trans Union's ACDV.

119.    Defendant Oriental Bank violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed Oriental Bank Mortgage Account was the product of identity theft.

**Defendant Equifax's Unreasonable Dispute Reinvestigation**

120.    Sometime after August 28, 2023 and prior to October 19, 2023, Defendant Equifax received from Plaintiff another dispute and request that identity theft information be blocked from

his credit file.

121.    Upon information and belief, Defendant Equifax sent Defendant Oriental Bank an ACDV pursuant to Plaintiff's dispute to Defendant Equifax.

122.    Upon information and belief, Defendant Oriental Bank received Defendant Equifax's ACDV and did not adequately reinvestigate Plaintiff's dispute.

123.    On October 19, 2023, Defendant Equifax issued dispute results to Plaintiff wherein it communicated that the disputed information was modified rather than blocked.

124.    In relation to its October 19, 2023 response, Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff.

125.    In relation to its October 19, 2023 response, Defendant Equifax failed to reinvestigate Plaintiff's dispute and failed to block the identity theft information.

126.    Defendant Equifax violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed charges were the product of identity theft.

**Defendant Oriental Bank's Unreasonable Dispute Investigation October 2023**

127.    Upon information and belief, Defendant Oriental Bank failed to adequately review all of the information provided to it by Plaintiff.

128.    Upon information and belief, Defendant Oriental Bank verified the disputed information as accurate in response to Defendant Equifax's ACDV.

129.    Defendant Oriental Bank violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed Oriental Bank Mortgage Account was the product of identity theft.

**Plaintiff Disputes Directly with Defendant Oriental Bank November 2023**

130.    On or about November 14, 2023, Plaintiff called Defendant Oriental Bank and again disputed the Oriental Bank Mortgage Account.

131.    Plaintiff spoke with Oriental Bank representative Manuel, who confirmed that the Oriental Bank Mortgage Account was associated with Plaintiff's Social Security Number.

132.    Oriental Bank representative Manuel also informed Plaintiff that the account holder name on the Oriental Bank Mortgage Account was "Jose Gonzalez Rodriguez," but that there was no date of birth associated with the Oriental Bank Mortgage Account.

133.    Oriental Bank representative Manual also provided that the property address associated with the Oriental Bank Mortgage Account was 10 St H6 Rafael Bermudez Fajardo, Puerto Rico.

134.    Plaintiff has never secured or applied to secure a mortgage for any property located at 10 St H6 Rafael Bermudez Fajardo, Puerto Rico.

135.    Plaintiff has never lived at or attempted to own any property located at 10 St H6 Rafael Bermudez Fajardo, Puerto Rico.

136.    Plaintiff does not know anyone affiliated with any property located at 10 St H6 Rafael Bermudez Fajardo, Puerto Rico.

137.    Oriental Bank representative Manual also provided that the primary applicants for the Oriental Bank Mortgage Account were Ignacio Caraballo and Monserate Feliciano.

138.    Plaintiff does not know Ignacio Caraballo or Monserate Feliciano.

139.    Plaintiff was shocked and again disputed the Oriental Bank Mortgage with Oriental Bank as the product of fraud and identity theft.

**Plaintiff's Third Dispute to the CRA Defendants and First Dispute to Non-Party Innovis Data Solutions, Inc. ("Innovis") November 2023**

140.    Distressed that his disputes continued to fall on deaf ears, and still concerned that eventually someone might seek to collect the approximately $40,000.00 mortgage and that the continued reporting of the Oriental Bank Mortgage Account would impact his existing credit and future requests for credit, Plaintiff determined that he needed to dispute the Oriental Bank Mortgage Account again.

141.    On November 27, 2023, Plaintiff again disputed the Oriental Bank Mortgage Account with the CRA Defendants. Specifically, Plaintiff disputed that the Oriental Bank Mortgage Account was not his, but rather the product of fraud and identity theft.

142.    On that same date, Plaintiff also disputed the Oriental Bank Mortgage Account with non-party Innovis.

143.    Plaintiff provided sufficient information to identify his credit file and sufficient information to support his dispute.

144.    Plaintiff requested that the identity theft information be blocked from his credit file.

**Defendant Equifax's Unreasonable Dispute Reinvestigation**

145.    On or about December 7, 2023, Defendant Equifax received Plaintiff's dispute and request that identity theft information be blocked from his credit file.

146.    On December 11, 2023, Defendant Equifax issued a letter to Plaintiff communicating that it would not block the disputed information.

147.    In that same letter, Defendant Equifax informed Plaintiff that it would forward her dispute to the furnisher of the disputed information.

148.    Upon information and belief, Defendant Equifax sent Defendant Oriental Bank an ACDV pursuant to Plaintiff's November 2023 dispute to Defendant Equifax.

149.    Upon information and belief, Defendant Oriental Bank received Defendant Equifax's ACDV and did not adequately reinvestigate Plaintiff's dispute.

150.    As of January 20, 2024, Defendant Equifax continued to report the disputed Oriental Bank Mortgage Account to Plaintiff's credit file and reports.

151.    Upon information and belief, Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff.

152.    Upon information and belief, Defendant Equifax failed to reinvestigate Plaintiff's November 2023 dispute and failed to block the identity theft information.

153.    Defendant Equifax violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed charges were the product of identity theft.

**Defendant Trans Union's Unreasonable Dispute Reinvestigation**

154.    On or about December 4, 2023, Defendant Trans Union received Plaintiff's dispute and request that identity theft information be blocked from his credit file.

155.    Upon information and belief, Defendant Trans Union sent Defendant Oriental Bank an ACDV pursuant to Plaintiff's November 2023 dispute to Defendant Trans Union.

156.    Upon information and belief, Defendant Oriental Bank received Defendant Trans Union's ACDV and did not adequately reinvestigate Plaintiff's dispute.

157.    As of January 20, 2024, Defendant Trans Union continued to report the disputed Oriental Bank Mortgage Account to Plaintiff's credit file and reports.

158.    Upon information and belief, Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff.

159.    Upon information and belief, Defendant Trans Union failed to reinvestigate

Plaintiff's November 2023 dispute and failed to block the identity theft information.

160.    Defendant Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed charges were the product of identity theft.

**Defendant Oriental Bank's Unreasonable Dispute Investigation November 2023**

161.    Sometime after November 27, 2023, and upon information and belief, Defendant Oriental Bank failed to adequately review all of the information provided to it by Plaintiff.

162.    Sometime after November 27, 2023, and upon information and belief, Defendant Oriental Bank verified the disputed information as accurate in response to Defendant Equifax's ACDV.

163.    Sometime after November 27, 2023, and upon  information and belief, Defendant Oriental Bank verified the disputed information as accurate in response to Defendant Trans Union's ACDV.

164.    Sometime after November 27, 2023, and upon information and belief, Defendant Oriental Bank received notice from non-party Innovis that it had blocked the disputed Oriental Bank Mortgage Account.

165.    Upon information and belief, Defendant Oriental Bank failed to request deletion of the disputed Oriental Bank Mortgage Account from Plaintiff's Equifax credit file.

166.    Upon information and belief, Defendant Oriental Bank failed to request deletion of the disputed Oriental Bank Mortgage Account from Plaintiff's Trans Union credit file.

167.    Defendant Oriental Bank violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed Oriental Bank Mortgage

Account was the product of identity theft.

**PLAINTIFF'S DAMAGES**

168.     Plaintiff did exactly what he should have done upon realizing he was the victim of identity theft.

169.     Plaintiff disputed directly with Defendant Oriental Bank on multiple occasions and explained that the Oriental Bank Mortgage Account was fraudulently opened and that he was the victim of identity theft.

170.     Plaintiff filed a police report.

171.     Plaintiff filed an FTC ID Theft Report.

172.     Plaintiff filed an FTC Identity Theft Affidavit.

173.     Plaintiff filed a complaint with the FDIC.

174.     Plaintiff disputed with the Credit Bureau Defendants multiple times throughout 2023.

175.     Plaintiff immediately identified himself as an identity theft victim and requested from that the Credit Bureau Defendants block the account information that was the product of identity theft.

176.     The Credit Bureau Defendants never deleted the Oriental Bank Mortgage Account that was the product identity theft despite Plaintiff's multiple disputes.

177.     Instead, the Credit Bureau Defendants repeatedly disregarded Plaintiff's credible disputes.  Often responding to a victim of identity theft that the furnisher of the account that was the product of identity theft had verified the account as accurate.

178.     The Credit Bureau Defendants understand it is often the case that an identity thief's activities, often designed intentionally to fabricate information into a credit file, will cause false information to appear on an identity theft victim's credit file.

179.    Despite Plaintiff's multiple disputes to the Credit Bureau Defendants that the Oriental Bank Mortgage Account was the product of fraud and he was a victim of identity theft, Defendants Equifax and Trans Union hardly waivered in their refusals to remove the same.

180.    Plaintiff reasonably believes that Defendant Oriental Bank failed to have the disputed account removed and continued to verify the Oriental Bank account as accurate to Defendants Equifax and Trans Union inaccurately suggesting that Plaintiff was responsible for the Oriental Bank Mortgage Account.

181.    As a direct result of Defendant Equifax's ardent refusal to remove the Oriental Bank account which was a product of identity theft, Defendant Equifax has continued to saddle Plaintiff with an open mortgage account that was the product of identity theft.

182.    As a direct result of Defendant Trans Union's ardent refusal to remove the Oriental Bank account, which was a product of identity theft, Defendant Trans Union has continued to saddle Plaintiff with an open mortgage account that was the product of identity theft.

183.    Further, as a direct result of Defendant Oriental Bank's verification of the disputed Oriental Bank Mortgage Account to Defendants Equifax and Trans Union, Defendant Oriental Bank has continued to saddle Plaintiff with an open mortgage account which was the product of identity theft.

184.    Due to Defendants' ardent refusals to comply with their respective obligations pursuant to the FCRA, Plaintiff's own mortgage applications were frustrated. Ultimately, when Plaintiff was finally able to convince an institution to approve him for a mortgage despite the Oriental Bank Mortgage Account still reporting to his credit reports, he was offered an interest rate of 9%.

185.    To reduce the interest rate and ultimately amount of interest he would pay over the

life of the mortgage, Plaintiff paid $9,000.00 to have the rate reduced to 7.2%.

186.     Furthermore, Plaintiff was forced to obtain legal advice and counsel, for which he incurred attorney's fees.

187.     Further, and due to Defendants' inexplicable refusal to remove fraudulent an open mortgage account  from an identity theft victim's consumer file, Plaintiff expended countless hours disputing the same with Defendants Equifax, Trans Union, and Oriental Bank, repeatedly, to no avail.

188.     Defendants' conduct has caused Plaintiff extreme and ongoing stress and anxiety. Plaintiff has suffered sleepless nights, frustration, worry, and ultimately felt utterly hopeless that Defendants would ever properly reinvestigate his disputes.  Further, Plaintiff reasonably believes that the fraudulent Oriental Bank account negatively impacted and depressed his credit score and debt to income ratio.  Plaintiff was hoping to obtain a mortgage at a favorable rate to buy a home, but after the Defendants failed to remove the fraudulent Oriental Bank account, Plaintiff feared his credit score was no longer good enough to qualify him for desirable mortgage terms and ultimately accepted a mortgage rate that was much higher than anticipated.

189.     At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

190.     At all times pertinent hereto, the conduct of Defendants, as well as that of their representative agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

191.     Plaintiff's ongoing stress and anxiety over the situation, and after repeatedly receiving one non-responsive communication after another from Defendants, Plaintiff feels a surge

of panic each time he receives another communication from Defendants.  His ongoing stress and anxiety regarding the situation has affected him and his relationships negatively.

192.    CRA Defendants Equifax and Trans Union have a long history of disregarding the credit reporting rights of identity theft victims under the FCRA.  For example, in the very similar matter of *April Hendrix vs. Equifax, et. al.*, (N.CM.D. C.A. No. 1-16-cv-201), an identity theft victim sued several CRAs, including CRA Defendants Equifax and Trans Union, over their repeated wrongful removal of security freezes, release of her credit reports for impermissible purposes, and refusal to properly reinvestigate disputed identity theft information on her credit reports.

193.    The *Hendrix* suit put the Credit Bureau Defendants on notice several years ago that their respective policies and procedures for implementing security freezes and handling identity theft victims' requests and disputes were woefully inadequate.

194.    The Credit Bureau Defendants have had years of notice in the form of federal lawsuits, despite it all, the Credit Bureau Defendants did not take any better steps to protect the Plaintiff here.

195.    The respective internal policies and procedures of the Credit Bureau Defendants do not appear to place any value on its obligations under the FCRA to report credit entries accurately, to reinvestigate carefully when notified of consumer disputes, and to avoid giving third parties access to consumers' reports without authorization or permissible purpose. Nor do the Credit Bureau Defendants' respective policies and procedures respect their statutory duties to enforce or at minimum add security freezes and fraud alerts as requested by the consumer.

196.    As a standard practice, the Credit Bureau Defendants do not conduct independent investigations in response to consumer disputes.  Instead, they merely parrot the response of the

data furnishers, like Defendant Oriental Bank here, despite numerous court decisions admonishing this practice.  See *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources.  Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

197.    The Credit Bureau Defendants are aware of the shortcomings of their respective procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, the Credit Bureau Defendants' violations of the FCRA are willful.

198.    The Credit Bureau Defendants' policies and procedures clearly establish willfulness, wantonness, and utter and reckless disregard for the rights and interests of consumers and led directly to the injuries of Plaintiff as described in this complaint.

199.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove an open and derogatory mortgage account that was the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove an open and derogatory mortgage account that was the product of identity theft.

200.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss,

reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by the Defendants.

**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to**
**Assure Maximum Possible Accuracy**
**(Defendants Equifax and Trans Union)**

201.    Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein.

202.    The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

203.    On numerous occasions, the Credit Bureau Defendants prepared patently false consumer reports concerning Plaintiff.

204.    Despite actual and implied knowledge that Plaintiff was the victim of identity theft, the Credit Bureau Defendants readily and repeatedly sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness by suggesting that Plaintiff had a mortgage account and that he was delinquent on at least one occasion.

205.    Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

206.    Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

207.    As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove an open and derogatory mortgage account that was the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove an open and derogatory mortgage account that was the product of identity theft.

208.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by the Credit Bureau Defendants.

209.    The Credit Bureau Defendants' conduct, actions, and inactions were willful, rendering Defendants Equifax and Trans Union liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, the Credit Bureau Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

210.    Plaintiff is entitled to recover attorneys' fees and costs from the Credit Bureau Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Defendants Equifax and Trans Union)**

211.    Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein at length.

212.    The FCRA mandates that a CRA conduct an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. See 15 U.S.C. § 1681i(a)(1).  The Act imposes a 30-day limitation for the completion of such an investigation. *Id*.

213.    The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file.  See 15 U.S.C. § 1681i(a)(5)(A).

214.    On numerous occasions in 2023, Plaintiff disputed the inaccurate information with the Credit Bureau Defendants and requested that they correct and/or delete a specific item in his credit file that is patently inaccurate, misleading, and highly damaging to him, namely, the fraudulent Oriental Bank Mortgage Account that was the product of identity theft which was a very stressful situation for the Plaintiff.

215.    Plaintiff disputed the identity theft information to the Credit Bureau Defendants several times to no avail.

216.    On at least one occasion, Plaintiff supported his dispute with a copy of the police report and the FTC ID Theft Report.

217.    Despite actual and implied knowledge that Plaintiff was the victim of identity theft, and in response to Plaintiff's disputes, Defendant Equifax conducted virtually no investigations of Plaintiff's disputes, or such investigations were so shoddy as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

218.    Despite actual and implied knowledge that Plaintiff was the victim of identity theft, and in response to Plaintiff's disputes, Defendant Trans Union conducted virtually no

investigations of Plaintiff's disputes, or such investigations were so shoddy as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

219.    Plaintiff expended resources in the form of time and money to repeatedly dispute the same account with the Credit Bureau Defendants, repeatedly.

220.    The Credit Bureau Defendants' "reinvestigations," were rendered that much more deficient considering their contemporary, Innovis deleted the same disputed information upon Plaintiff's first dispute and certainly in a far more reduced timeline.

221.    The Credit Bureau Defendants' repeated refusals to delete the disputed Oriental Bank Mortgage Account provided credibility to that account, forcing an identity theft victim to be repeatedly confronted with the evidence of identity theft.

222.    Defendant Equifax violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

223.    Defendant Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

224.    As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff

suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove an open and derogatory mortgage account that was the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove an open and derogatory mortgage account that was the product of identity theft.

225.     Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by the Credit Bureau Defendants.

226.     The Credit Bureau Defendants' conduct, actions, and inactions were willful, rendering the Credit Bureau Defendants liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, the Credit Bureau Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

227.     Plaintiff is entitled to recover attorneys' fees and costs from the Credit Bureau Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### COUNT III
### 15 U.S.C. § 1681c-2
### Failure to Block Identity Theft Information
### (Defendants Equifax and Trans Union)

228.     Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

229.     Defendant Equifax violated 15 U.S.C. § 1681c-2 by failing to block the reporting

of the disputed information which was due to identity theft from Plaintiff's file.

230. Defendant Trans Union violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed information which was due to identity theft from Plaintiff's file.

231. Plaintiff repeatedly submitted ample evidence of the fact that he was an identity theft victim.  Plaintiff further supported the fact that he was an identity theft victim by providing to the Credit Bureau Defendants copies of the Police Report and FTC IDT Report.

232. The Credit Bureau Defendants should have blocked the identity theft information but failed to do so at every turn.

233. As a result of the Credit Bureau Defendants ' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove an open mortgage account that was the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove an open mortgage account that was the product of identity theft.

234. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by the Credit Bureau Defendants.

235. The Credit Bureau Defendants' conduct, actions, and inactions were willful, rendering the Credit Bureau Defendants liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, the Credit Bureau Defendants were negligent, entitling Plaintiff to recover under 15

U.S.C. § 1681o.

236.    Plaintiff is entitled to recover attorneys' fees and costs from the Credit Bureau Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT IV**
**15 U.S.C. § 1681s-2b**
**Failure to Conduct an Investigation of the Disputed Information and Review of all Relevant Information Provided by the Consumer**
**(Defendant Oriental Bank Only)**

237.    Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein at length.

238.    Defendant Oriental Bank refused to remove information that was the product of identity theft—namely the Oriental Mortgage Bank Account.

239.    Defendant Oriental Bank violated 15 U.S.C. § 1681s-2(b) by failing to investigate Plaintiff's dispute(s), or otherwise by failing to fully and properly investigate Plaintiff's dispute(s), including but not limited to failing to review all relevant information regarding the same; by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to the Credit Bureau Defendants; and, by failing to cease furnishing inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to the Credit Bureau Defendants.

240.    As a result of Defendant Oriental Bank's  conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove an open mortgage account that was the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the an open mortgage

account that was the product of identity theft.

241.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by Defendant Oriental Bank.

242.    Defendant Oriental Bank's conduct, actions, and inactions was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, Defendant Oriental Bank was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

243.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant Oriental Bank in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant the following relief against Defendants:

(a)    Declaratory judgment that Defendants violated the FCRA, 15 U.S.C. § 1681;

(b)    An award of actual, statutory, and punitive damages pursuant to 15 U.S.C. §§ 1681, et seq.;

(c)    An award of costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n and § 1681o; and,

(d)    Such other and further relief as this Honorable Court may deem just and proper, including any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

## **JURY DEMAND**

Plaintiff hereby demands jury trial on all issues so triable.

RESPECTFULLY SUBMITTED on this 19th day of April, 2024.

By: */s/ Kendra Penningroth*
Kendra Penningroth
AZ Bar #037119
CONSUMER ATTORNEYS
8245 N. 85th Way
Scottsdale, AZ 85258
T: 480-626-1447
F: 718-715-1750
E: kpenningroth@consumerattorneys.com